PEOPLE ex rel. McCARTHY v. SHEA, Commissioner, et al.

(Supreme Court, Appellate Division, Second Department.   May 29, 1900.)

MUNICIPAL CORPORATIONS—OFFICERS—REMOVAL NOTICE—FILING OF REASONS—
ABOLITION OF POSITION.

    Laws 1898, c. 186, provides that, if a person holding a position subject
to competitive examination in the civil service shall be removed, the rea-
sons therefor shall be stated in writing, and filed with the head of the
department, and the person so removed shall have an opportunity to make
an explanation.  Greater New York Charter (Laws 1897, c. 378) § 601,
devolves on the commissioner of bridges and the municipal assembly all
the duties and powers theretofore exercised by the trustees of the New
York and Brooklyn Bridge.  Section 595 provides that the commissioner
shall have control of the bridge and of the operation of the railroad
thereon.  Laws 1897, c. 663 (passed after the charter act), authorizes the
bridge trustees to make contracts with railroad corporations for the opera-
tion of the bridge railroad, and that the trustees may maintain and operate
the railroad across the bridge.  Held, that the commissioner of bridges
had authority to enter into a contract whereby he turned the operation
of the railroad over to a private corporation, where he retained general
control over the operation of the road, and the employés were subject to
his approval; and a conductor who had been in the employ of the trus-
tees, his position being subject to competitive examination, is not entitled
to reinstatement in the position from which he was removed by reason
of the abandonment by the trustees of the operation of the road, though
the reasons of his removal were not stated in writing, and filed with the
head of the department, the abolition of his position being made by the
commissioner in good faith in the administration of his duties.

    Appeal from special term, Kings county.

    Application by the people, on the relation of Patrick J. McCarthy,
against John L. Shea, as commissioner of bridges of the city of New
York, and another, for a writ of mandamus to compel the respondents
to reinstate relator in the position of conductor on the New York and
Brooklyn Bridge.  From an order dismissing an alternative writ and
denying the application for a peremptory writ, relator appeals.  Af-
firmed.

    Argued before GOODRICH, P. J., and BARTLETT, WOODWARD,
HIRSCHBERG, and JENKS, JJ.

    Samuel H. Ordway, for appellant.
    William J. Carr, for respondents.

    WILLARD BARTLETT, J.  In 1897 the trustees of the New York
and Brooklyn Bridge, pursuant to an act of the legislature passed in
.that year (chapter 663, Laws 1897), made a contract with the Brooklyn
Elevated Railroad Company whereby that corporation was enabled
to have its trains operated over the bridge by persons in the employ
of the trustees.  Under this contract the trustees did not wholly with-
draw the independent train service which had previously been main-
tained, but ran some trains for themselves and some for the Brooklyn
Elevated Railroad Company.  By the Greater New York charter the
powers and duties of the trustees of the New York and Brooklyn
Bridge were devolved upon the newly created commissioner of bridges
and the municipal assembly.  Laws 1897, c. 378, § 601.  Mr. Shea,
the first incumbent of the office of commissioner, having reached the

conclusion that the contract of 1897 operated disadvantageously to the city, procured a modification of that agreement in·June, 1898, so as to require the Brooklyn Elevated Railroad Company to operate its own cars over the bridge by its own power, and so as also to provide that said corporation should operate the local bridge trains, which had theretofore been run by the bridge authorities through the agency of their own subordinates. The change of system effected by this amendatory contract of 1898 rendered it unnecessary for the city to continue to employ the men who had been engaged in the train service of the municipality on the New York and Brooklyn Bridge, and they were discharged by the commissioner, 392 of them in all, on July 1, 1898, when he finally ceased to operate the local line between the Brooklyn and Manhattan terminals. One of the employés thus discharged was the relator, a conductor, whose position was subject to competitive examination in the civil service of the city of New York. No reasons for ceasing to employ him were stated in writing, or filed with the head of the department, nor was he afforded an opportunity to make an explanation. He contends that these omissions invalidated the action of the commissioner of bridges, under chapter 186 of the Laws of 1898, which was then in force, and which prescribed that, "if a person holding a position subject to competitive examination in the civil service of the state or of a city shall be removed or reduced, the reasons therefor shall be stated in writing and filed with the head of the department or other appointing officer, and the person so removed or reduced shall have an opportunity to make an explanation." In the court below, however, the commissioner successfully took the ground that what he had done was only to abolish the position held by the relator, rather than to remove the relator from it; and that under such circumstances the statutory requirements as to the filing of reasons and affording an opportunity to explain had no application. On the present appeal, while denying the correctness of this view, the relator also answers it by the proposition that the commissioner of bridges had no legal power to abolish the relator's position in the manner he attempted to do by making the amendatory contract of 1898 with the Brooklyn Elevated Railroad Company.

The appellant concedes that the courts have held that it is not necessary to give a hearing or to afford an opportunity for an explanation where a position is legally abolished in good faith for purposes of economy; but argues that, even in such cases it is still necessary to a valid removal that the reasons therefor should be stated in writing, and filed with the head of the department. The authorities which the appellant cites do not sustain this proposition. In none of them was it found by the trial court, as it has been adjudged here, upon adequate and satisfactory evidence, that the position in controversy had been actually abolished in good faith. The gist of the decision in Lethbridge v. City of New York, 133 N. Y. 232, 30 N. E. 975, was that a clerk in the department of public works in New York City under an appointment stating that he was to be paid from a particular appropriation might be discharged upon the exhaustion of the appropriation, without a hearing, under section 48 of the consolidation act. In the case of People v. Dalton, 44 App. Div. 556, 60 N. Y.

Supp. 909, we held that the mere statement by the removing officer that a removal was "for the good of the service" was ineffectual to show that a position had been actually abolished in good faith. In People v. Feitner, 49 App. Div. 101, 62 N. Y. Supp. 969, 63 N. Y. Supp. 209, the question was not one of the abolition of a position, but of a reduction in grade; and it was decided that a deputy tax commissioner could not be reduced in grade without a statement of the reasons for such change, and an opportunity to make an explanation, under the act of 1898. These cases are very far from holding that the actual abolition of a position by an appointing officer acting bona fide and in the interest of an economical administration of the government cannot be legally or effectively accomplished unless such officer files with himself a statement in writing of his reasons for abolishing the position. There is certainly no such requirement in the letter of the law, and the spirit of the enactment does not demand that we should read it into the statute. The suggestion that a statement of the reasons would enable the subordinate more conveniently to dispute the good faith of the alleged abolition of his place or post of service might be made to the legislature as an inducement to amend the law, but ought hardly to influence the courts to extend its meaning.

The bridge commissioner's defense that the relator's position was abolished rests, of course, upon the amended contract of 1898 with the Brooklyn Elevated Railroad Company and the acts done in pursuance of that contract. The appellant attacks the agreement and the commissioner's action thereunder as illegal and void—First, on the ground that the commissioner could not devest himself of the control and management of the operation of the bridge railroad; and, secondly, because, even if he could do so under any circumstances, he would require the authority and approval of the municipal assembly, the board of estimate and apportionment, the board of public improvements, and the sinking fund commission. Neither of these points seems to me to be tenable. Under section 595 of the Greater New York charter, the commissioner of bridges "shall have cognizance and control: (1) Of the management and maintenance of the New York and Brooklyn Bridge. (2) Of the operation of the railroad on the New York and Brooklyn Bridge. (3) Of the collection of fares. and of tolls on the New York and Brooklyn Bridge." This section did not impose upon the commissioner the obligation to operate the existing bridge railroad through agents or subordinates directly employed by him or by the municipality. It must be read in connection with section 601, devolving upon the commissioner the powers and duties vested in the trustees of the New York and Brooklyn Bridge "by any law or statute." One of the statutes thus referred to was chapter 663 of the Laws of 1897 (passed after the charter in the same year) entitled "An act providing for and regulating the carriage of passengers across the New York and Brooklyn Bridge and affecting the rates of fare therefor." It was this act which authorized the trustee to make contracts with railroad corporations for the carriage of passengers across the bridge. The second section thereof reads as follows: "The said trustees may continue to maintain and to operate

the present railroad on said bridge and to charge such fares for the carriage of passengers thereon as they may deem fit, but not, however, in excess of the present rate." The language is permissive, not mandatory; "may," not "shall" or "must." The intent of the legislature seems to have been to leave the matter to the discretion of the trustees, to be exercised, as should seem to be most advantageous to the public interest, by them and by the commissioner of bridges as their successor. In ceasing to operate the local line by aid of the former employés, and turning the operation thereof over to the Brooklyn Elevated Railroad Company, the commissioner did not part with the cognizance and control conferred upon him by the charter. An examination of the terms of the amendatory contract of 1898 shows this. Thus he is to determine what shall be the adequate train service which the corporation undertakes to furnish for such of the public as desire only to travel between the termini of the local railroad. He is to inspect and supervise the operation of such local railroad, and give such directions in relation thereto as will insure proper service to the public. He is to designate the switchmen to operate the tower and other switches, and all of the employés of the corporation in the operation of said local line are to be subject to the approval of the commissioner. Many other provisions of the agreement might be cited to show that he has retained his charter functions of cognizance and control. If I am correct in the conclusion that the commissioner of bridges has not devested himself of his authority in this respect, it becomes unnecessary to inquire at any length whether he would need the sanction of the municipal assembly or other city functionaries in order to do so. A few suggestions may be made, however, as to this portion of the argument for the appellant. The amendatory contract was in no proper sense the grant of a franchise within the meaning of the charter; nor was it a lease of city property such as falls under the control of the commissioners of the sinking fund. Indeed, it cannot properly be characterized as a lease at all. It was simply a modification of a pre-existing agreement, which had been entered into by express legislative authority. It is argued that, inasmuch as section 601 of the charter devolves the former powers of the bridge trustees not only upon the new commissioner of bridges, but also upon the municipal assembly, it follows that the municipal assembly was a necessary party to the amendatory contract. This provision, however, must be construed with the other clauses of the charter having reference to the relation of the municipal assembly to the affairs of the New York and Brooklyn Bridge. Taking them altogether, they manifest an intent to confer upon the municipal assembly a power to legislate in regard to those affairs, if it sees fit to do so, but not to authorize it to act in an administrative capacity. Thus it would seem that any regulation of the rates of fare on the bridge railroad and upon the roadways thereof by the municipal assembly would have to be made by means of a city ordinance proposed by the board of public improvements (Laws 1897, c. 378, § 416, subd. 12; Id. § 417); and certainly that, until some legislation on the subject, the commissioner of bridges could continue to exercise those powers in respect to bridge fares which had been exercised by

the former trustees (see Blank v. Kearny, 44 App. Div. 592, 596, 61 N. Y. Supp. 79). I think that this case was rightly decided below, and that the order appealed from should be affirmed.

Order affirmed, with $10 costs and disbursements. All concur.